**The GUARDIAN LIFE INSURANCE COMPANY OF AMERICA**

v.

**AMERICAN GUARDIAN LIFE ASSURANCE COMPANY.**

**Civil Action No. 95–3997.**

United States District Court, E.D. Pennsylvania.

Aug. 14, 1996.

Virginia R. Richard, Lana C. Fleishman, Maribel Figueredo, Kane, Dalsimer, Sullivan, Kurucz, Levy, Eisele & Richard, New York City, Jeffrey R. Lerman, Steven Maniloff, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for plaintiff.

Michael K. Sullivan, James R. MacRae, Drinker, Biddle & Reath, Philadelphia, PA, Joseph D. Garon, Doreen L. Costa, Parker H. Bagley, Brumbaugh, Graves, Donohue and Raymond, New York City, for defendant.

## MEMORANDUM

PADOVA, Judge.

Plaintiff, the Guardian Life Insurance Company of America, brings this action against Defendant, American Guardian Life Assurance Company, for trademark infringement and unfair competition under the Lanham Trademark Act and Pennsylvania law, seeking damages and injunctive relief. Currently before the Court are the parties' cross-motions for summary judgment and Plaintiff's motion *in limine* to exclude evidence. For the reasons that follow, Defendant's motion for summary judgment will be denied. Plaintiff's motion for summary judgment will be granted in part and denied in part and Plaintiff's motion *in limine* will be denied in part.

## I. FACTUAL BACKGROUND

Plaintiff, a New York corporation with its principal place of business in New York City, is one of the largest mutual insurers in the United States, specializing in individual life insurance, disability insurance, group health and life insurance, equities, and annuities. Plaintiff claims it has used the corporate name THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA and the marks GUARDIAN and THE GUARDIAN ("THE GUARDIAN names and marks") throughout the United States for over seventy years and is the owner of numerous United States Service Mark Registrations. Plaintiff has been licensed to sell insurance in all fifty states and the District of Columbia since 1948 and has sold insurance in the Commonwealth of Pennsylvania under the name and mark GUARDIAN for over fifty years.

Defendant, American Guardian Life Assurance Corporation, is a Maryland corporation with its principal place of business in Blue Bell, Pennsylvania. Defendant is licensed to sell insurance in approximately 40 states and the District of Columbia and specializes in term and whole life insurance as well as annuities. Because Defendant's corporate history is relevant to the analysis that follows, it is set forth here in detail.

Defendant's history begins in late 1971 when Philadelphia Financial Group acquired the license and assets of a Pennsylvania corporation named 20th Century Life Insurance Company. After the acquisition, the name was changed to American Guardian Life Assurance Company ("AGL–PA"). From approximately 1972 to 1978, AGL–PA sold insurance exclusively in Pennsylvania. In approximately 1978, AGL–PA obtained a license to sell insurance in Delaware.

In the early 1980's, AGL–PA entered into a joint venture with Integrity Life Insurance Company ("Integrity") whereby AGL–PA marketed its products under Integrity's name in several jurisdictions outside the states in which AGL–PA was licensed. AGL–PA later assumed the business of Integrity. On January 23, 1986, AGL–PA obtained a Pennsylvania state service mark registration for the mark "American Guard-

ian Life Assurance Company" superimposed over the enlarged letters "AGL."[1]

In December 1984, AGL–PA and Plaintiff entered into a reinsurance treaty whereby Plaintiff provided AGL–PA with surplus relief to protect against claims brought by AGL–PA policy holders. The treaty was a financing arrangement created to increase AGL–PA's surplus position to meet minimum capital/surplus requirements. The treaty was executed on behalf of Plaintiff by John C. Angle, Plaintiff's president at the time, and by Thomas Kabele, Plaintiff's Vice President and Corporate Actuary. The treaty remained in force until September 1988.

In 1985, AGL–PA acquired a shell corporation named Annapolis Life Insurance Company ("Annapolis"). Annapolis was incorporated in Maryland and licensed to sell insurance in 21 states and the District of Columbia.[2] At the time of its acquisition, Annapolis had no existing insurance business, no agents and no policy holders.

AGL–PA operated Annapolis as a separate entity from 1985 to 1991.[3] On January 1, 1991, AGL–PA transferred virtually all of its assets to Annapolis, including its insurance policies currently in force.[4] Annapolis changed its name to American Guardian Life Assurance Company, the Defendant in this case. AGL–PA, now only a shell, simultaneously changed its name to Omni Life, and became a subsidiary of Defendant. As of December 1991, Omni Life was liquidated and all its remaining assets were transferred to Defendant. As a result of this transfer of assets, Defendant was licensed to sell insurance in 23 states and the District of Columbia.

Following the asset transfer in 1991, Defendant sought to expand its business by acquiring licenses to sell insurance in additional states. To date, Defendant is licensed to sell insurance in 40 states, and is actively conducting business in approximately 33 of those states.

On September 12, 1994, Plaintiff mailed a notice of infringement to Defendant demanding that it cease use of the term "GUARDIAN." Defendant alleges that on September 28, 1994, Plaintiff sent a letter to the Insurance Commissioner of the State of Hawaii protesting the issuance of a license to Defendant. Defendant alleges that Plaintiff sent similar letters to the Insurance Commissioners of eleven other states. The letters allegedly contained the following representations of fact, each of which Defendant contends is false:

1. Defendant has recently expanded its use of the name American Guardian from its initial two-state sales territory to twenty-seven states;

2. Defendant has changed its product mix from annuities to term and ordinary life insurance as well as health and disability insurance; and

3. Defendant's geographic expansion, change of product emphasis from annuities to life insurance, and expansion into health insurance appears to be designed to create confusion.

## II. PROCEDURAL BACKGROUND

Plaintiff filed its four count Complaint on June 27, 1995, asserting: (1) trademark infringement in violation of § 32 of the Lanham Act, 15 U.S.C.A. § 1114 (West 1963 & Supp.1996) (Count I); (2) false designation of origin, descriptions and/or representations in violation of § 43 of the Lanham Act, 15 U.S.C.A. § 1125 (West 1982 & Supp.1996) (Count II); (3) dilution under the Pennsylvania Trademark Act, 54 Pa.Cons.Stat.Ann. § 1124 (West Supp.1996) (Count III); and (4) unfair competition under Pennsylvania common law (Count IV).

1. Defendant's Pennsylvania service mark registration appears to have expired on January 23, 1996. (Richard Dec. 6/3/96 ¶ 7 & Ex. 5)

2. There appears to be some disagreement among the parties as to whether Annapolis was originally licensed in 22 or 23 jurisdictions.

3. Defendant argues that it sought to build an association between AGL–PA and Annapolis through various marketing and promotional techniques.

4. Excluded from the transfer were sufficient funds to allow AGL–PA to continue to exist as a viable insurance company under Pennsylvania law.

Defendant filed its Amended Answer on August 3, 1995, asserting numerous affirmative defenses including laches, acquiescence, and equitable estoppel. Defendant also asserted the following six counterclaims: (1) false descriptions and representations of fact in violation of § 43 the Lanham Act, 15 U.S.C.A. § 1125(a) (Counterclaim I); (2) unfair competition under Pennsylvania common law (Counterclaim II); (3) libel and trade libel under 42 Pa.Cons.Stat.Ann. § 8343(a) and Pennsylvania common law (Counterclaim III); (4) declaratory judgment that Defendant is entitled to use its names and service marks (Counterclaim IV); (5) cancellation, in whole or in part, of Plaintiff's pleaded registrations under § 37 of the Lanham Act, 15 U.S.C.A. § 1119 (West 1982) (Counterclaim V); and (6) declaratory judgment that Defendant is entitled to federal registration of its service marks (Counterclaim VI).

Plaintiff filed a motion to dismiss Defendant's counterclaims pursuant to Fed. R.Civ.P. 12(b)(6). In a Memorandum and Order filed December 11, 1995, this Court granted Plaintiff's motion as to Counts I and II of Defendant's counterclaims and denied the motion as to Defendant's remaining counterclaims. Plaintiff's subsequent motion for reconsideration was also denied.

Many disputes arose between the parties during the course of discovery. Among the most contentious was Defendant's desire to take oral depositions of numerous third party users of the term "GUARDIAN." Defendant sought such depositions from third party users both inside and outside the insurance industry. At a hearing to resolve the parties' discovery disputes, the Court determined that the information sought by Defendant was relatively simple and could be procured by stipulation of the parties. In the absence of a sufficiently developed record, the Court declined to rule on the admissibility of such evidence. However, Plaintiff expressly reserved its right to object to the admissibility of the stipulations at the appropriate time. The parties have submitted their joint stipulations as to these users, although Plaintiff maintains its objections to the admissibility of this evidence.

## III. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

An issue is "genuine" only if there is sufficient evidence from which a reasonable jury could find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Furthermore, bearing in mind that all uncertainties are to be resolved in favor of the non-moving party, a factual dispute is only "material" if it might affect the outcome of the case. *See id.* at 248, 106 S.Ct. at 2510.

A party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. at 2554. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. With these standards in mind I address the parties' motions.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

■ Defendant bases its motion for summary judgment on four closely related affirmative defenses. They are: (1) violation of the applicable limitations period; (2) laches;

(3) equitable estoppel;[5] and (4) acquiescence. As the factual allegations supporting these defenses are essentially the same, I will examine the parameters of each defense *seriatim* and then discuss the factual contentions relevant to all of the asserted defenses.

## A. Statute of Limitations

■ In infringement litigation over a federally registered mark, the Lanham Act provides no express statute of limitations, but vests the court with the power to grant injunctions "according to the principles of equity" 15 U.S.C.A. § 1116(a), and to award profits and damages "subject to the principles of equity." 15 U.S.C.A. § 1116. The general rule is that where a federal statute provides no express statute of limitations, the court must look to the state statute of limitations for analogous types of actions. *Monkelis v. Scientific Sys. Serv.*, 653 F.Supp. 680, 684 (W.D.Pa.1987) (citing *Fox Chemical Co. v. Amsoil, Inc.*, 445 F.Supp. 1355, 1357 (D.Minn.1978)).

Counts I and II of Plaintiff's Complaint are brought pursuant to §§ 32 and 43 of the Lanham Act respectively. Plaintiff's infringement action under § 32 is based on the same conduct underlying the § 43(a) claim. Many courts have held that actions under § 43(a) of the Lanham Act are most closely analogous to actions for fraud, and that the statute of limitations for state fraud actions applies.[6] *See e.g., Mylan Lab., Inc. v. Pharmaceutical Basics, Inc.*, 808 F.Supp. 446, 453–54 (D.Md.1992); *Johannsen v. Brown*, 797 F.Supp. 835, 839–40 (D.Or.1992); *Monkelis*, 653 F.Supp. at 684; *PepsiCo, Inc. v.*

*Dunlop Tire & Rubber Corp.*, 578 F.Supp. 196, 199 (S.D.N.Y.1984). In Pennsylvania, the limitations period for fraud is two years. 42 Pa.Cons.Stat.Ann. § 5524(7).

■ Count III states a claim for dilution under the Pennsylvania Trademark Act. 54 Pa.Cons.Stat.Ann. § 1124. Like the Lanham Act, the Pennsylvania Trademark Act does not provide an express limitations period. However, 42 Pa.Cons.Stat.Ann. § 5524(7) provides a two year limitation period in any "action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct" unless otherwise specified. Dilution fits within the purview of § 5524(7) thereby making the limitations period 2 years.

■ Count IV of Plaintiff's Complaint asserts a claim for unfair competition. The elements of a cause of action for unfair competition under Pennsylvania common law are identical to those for a claim under § 43(a) of the Lanham Act, with the exception that the goods need not have traveled in interstate commerce. *Moore Push–Pin Co. v. Moore Business Forms, Inc.*, 678 F.Supp. 113, 116 (E.D.Pa.1987) (quoting *Mercury Foam Corp. v. L & N Sales & Marketing*, 625 F.Supp. 87, 91 n. 1 (E.D.Pa.1985)). Therefore, the same 2 year limitations period under § 5524(7) applies.

■ Having concluded that Pennsylvania' two year statute of limitations applies to each of Plaintiff's claims, the question of what effect the limitations period has in the instant case remains. It is undisputed that because

---

**5.** Estoppel, in the context of infringement actions, is closely related to laches and acquiescence. The essence of an estoppel defense is that the defendant changed its position in reliance upon the misleading representation of the plaintiff. *Anheuser–Busch, Inc. v. Du Bois Brewing Co.*, 175 F.2d 370, 375 (3d Cir.1949), *cert. denied*, 339 U.S. 934, 70 S.Ct. 664, 94 L.Ed. 1353 (1950). In his excellent treatise on trademarks and unfair competition, Professor McCarthy does not identify estoppel as a separate defense, but refers repeatedly to "estoppel by laches" and "estoppel by acquiescence." *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 30.01–30.03 (3d ed. 1996) (hereinafter "*McCarthy on Trademarks*"). In this case, all of the defenses asserted in Defendant's motion are

based on the same facts. Therefore, Defendants equitable defenses are characterized herein as "estoppel by laches" and "estoppel by acquiescence."

**6.** Some courts have held that actions under § 43(a) of the Lanham Act are most closely analogous to state tort actions for injury to personal property. *Ameritech, Inc. v. American Info. Technology Corp.*, 811 F.2d 960, 963 (6th Cir.1987); *Construction Technologies v. Lockformer Co., Inc.*, 704 F.Supp. 1212, 1221 (S.D.N.Y.1989). The Pennsylvania statute of limitations for tortious injury to persons and personal property is identical to the limitations period for fraud. 42 Pa. Cons.Stat.Ann. § 5524.

the alleged offensive conduct is a continuing wrong, application of the statute of limitations will not bar to prospective injunctive relief. What is less clear is the effect the statute of limitations has on Plaintiff's claims for an accounting of profits and damages stemming from Defendant's past use of the term "GUARDIAN." Some courts have applied statutes of limitations to preclude claims under the Lanham Act that fall outside the statutory period. *See e.g. Gordon & Breach Science Publishers v. AIP*, 859 F.Supp. 1521, 1529 (S.D.N.Y.1994); *Construction Technology v. Lockformer Co., Inc.*, 704 F.Supp. 1212 (S.D.N.Y.1989); *PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.*, 578 F.Supp. 196, 201 (S.D.N.Y.1984). Other courts have rejected this approach, holding that the equitable doctrine of laches, and not statutes of limitations, is the appropriate method for determining the availability of damages and injunctive relief under the Lanham Act. *See Ediciones Quiroga S.L. v. Fall River Music, Inc.*, 35 U.S.P.Q.2d 1814, 1818, 1995 WL 103842 (S.D.N.Y.1995) (declining to adopt the reasoning of *Gordon, Construction Technology,* and *PepsiCo, supra,* and deciding instead that laches provides the proper defense under the Lanham Act). *See also Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir.1985) (applying statute of limitations only to raise a presumption of laches).

■ Courts within the Third Circuit have not spoken to this issue. However, it is not necessary for this Court to resolve this question at this juncture. As will be discussed in greater detail *infra,* genuine issues of material fact exist with regard to when Plaintiff knew or reasonably should have known of Defendant's alleged infringement.[7] It is therefore impossible to know with certainty when the limitations period began to run, and whether Plaintiff initiated suit within two years thereof. I conclude that Defendant's statute of limitations argument cannot serve as the basis for granting Defendant's motion for summary judgment.

**B. Estoppel by Laches**

■ The doctrine of laches consists of two elements: (1) inexcusable delay in instituting suit and (2) prejudice resulting to the defendant from such delay. *University of Pittsburgh v. Champion Prods., Inc.*, 686 F.2d 1040, 1044 (3d Cir.1982); *Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1258 (3d Cir.1974). Laches is an equitable doctrine; its existence depends on the particular equitable circumstance of each case. It is a question left to the sound discretion of the district judge whose determination will not be disturbed on appeal absent an abuse of that discretion. *University of Pittsburgh,* 686 F.2d at 1045; *Gruca,* 495 F.2d at 1258; *Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410 (E.D.Pa.1980).

■ Laches may act to bar both monetary and prospective injunctive relief. *See Procter & Gamble Co. v. J.L. Prescott Co.*, 102 F.2d 773, 780 (3d Cir.), *cert. denied,* 308 U.S. 557, 60 S.Ct. 80, 84 L.Ed. 461 (1939) (denying counterclaim injunction in infringement action, despite likelihood of confusion, due to unexplained eight year delay). However, the more typical case of laches results in a denial of plaintiff's claim for an accounting of past infringement, but allows prospective injunctive relief to prevent future infringement and confusion. *See University of Pittsburgh,* 686 F.2d at 1044 (noting that, in the context of "mere delay" or "laches without more," "the much more common situation [is one] in which the plaintiff's less egregious delay will bar its claim for an accounting for past infringement but not for prospective injunctive relief").

■ The relationship between statutes of limitations and laches is unclear in trademark cases. In other contexts, courts within the Third Circuit have applied a burden shifting analysis to a laches defense where the delay exceeds the applicable limitations period. In *Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410 (E.D.Pa.1980), the defendant asserted a laches defense to an

---

**7.** "[I]n actions based upon federally created rights where a species of fraud is present in the case, the limitations period does not begin to run until the fraud is discovered or when, with due diligence, should have been discovered." *Jennings v. Boenning & Co.*, 388 F.Supp. 1294, 1302 n. 13 (E.D.Pa.), *aff'd,* 253 F.2d 889 (3d Cir.1975).

allegation of misappropriation of trade secrets. The court held that the allocation of the burden of proof in a laches defense depends on the length of the plaintiff's delay.

> If the delay is shorter than the applicable statute of limitations, then the defendant has the burden of proof. If, on the other hand, the delay is longer than the applicable statute of limitations, then the defendant is entitled to a rebuttable presumption of both elements of laches.

*Id.* at 427; *accord Frank W. Winne & Son, Inc. v. Palmer,* Civ.A. No. 91–2239, 1991 WL 155819, at \*5 (E.D.Pa. Aug. 7, 1991).

While this burden shifting analysis is also used by courts in patent infringement litigation, *See McCarthy on Trademarks* § 31.08[1], it is not clear whether it is transferable to trademark cases. In *University of Pittsburgh,* 686 F.2d at 1045, the United States Court of Appeals for the Third Circuit, in the context of analyzing a trademark laches defense, noted in dicta the significance of recent cases within the Third Circuit that held, in other contexts, that where the plaintiff "sleeps on his rights for a period of time greater than the applicable statute of limitation, the burden of proof [in a laches defense] shifts to the plaintiff to prove the absence of such prejudice to the defendant as would bar all relief." *Id.*

The United States Court of Appeals for the Sixth Circuit has expressly held that, in trademark cases under the Lanham Act, if the analogous state statute of limitations has not elapsed there is a strong presumption that the plaintiff's delay in bringing suit for monetary relief is reasonable. *Tandy Corp. v. Malone & Hyde, Inc.,* 769 F.2d 362, 366 (6th Cir.1985); *see also AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1546 (11th Cir. 1986) (citing *Tandy Corp.* with approval); *but see Clamp Mfg. Co. Inc. v. Enco Mfg. Co., Inc.,* 870 F.2d 512, 515 (9th Cir.1989) (declining to adopt the rule in *Tandy Corp.* and finding no laches defense on other grounds). The corollary of the rule in *Tandy Corp.* is that a delay in excess of the relevant limitations period raises a presumption that the delay is unreasonable.

I conclude that the burden shifting analysis that courts within the Third Circuit have

applied in other contexts is equally applicable to a laches defense in cases of trademark infringement. If Plaintiff's delay in bringing suit exceeds the applicable two year statute of limitations, a rebuttable presumption is raised that the delay was unreasonable. The Defendant continues to carry the burden of proving prejudice resulting from the delay and the scope of the relief afforded will depend on the unique equitable circumstances of each case.

### C. Estoppel by Acquiescence

"There is much semantic confusion in the case opinions over the distinction, if any, between 'laches,' 'estoppel by laches' and 'acquiescence.'.... To preserve some semantic sanity in the law, it is appropriate to reserve the word 'acquiescence' for use only in those cases where the trademark owner, by affirmative word or deed, conveys its implied consent to another. That is, laches denotes a merely passive consent, while acquiescence implies active consent. In this set of definitions, we would have 'estoppel by laches' as distinct from 'estoppel by acquiescence.' "

*McCarthy on Trademarks* § 31.14[1].

▄▄ To succeed in its acquiescence defense, Defendant must demonstrate that Plaintiff undertook some affirmative action that conveyed its implied consent to allow Defendant to use the term "GUARDIAN."

### D. Discussion

The primary point of contention between the parties with respect to Defendant's asserted defenses is the question of when Plaintiff knew, or should have known, of Defendant's alleged infringement. One clearly defined factual dispute is the significance of the reinsurance agreement (or treaty) between AGL–PA and Plaintiff. Defendant argues that Plaintiff's execution of the reinsurance treaty demonstrates not only that it knew of Defendant's predecessor's use of "GUARDIAN," but that Plaintiff's subsequent failure to take action against Defendant for the alleged infringement represents acquiescence to Defendant's use.

In trademark cases, the general rule is that in order to impute an agent's knowledge to the principal, the agent must have duties with respect to trademark matters, although the agent need not have acquired the knowledge in connection with those duties. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 363 (2d Cir.1959). However, knowledge by even a lower level employee will be imputed to the corporation where "it is inconceivable that the party charged with laches would have been unaware of the use of the mark." *Georgia–Pacific Corp. v. Great Plains Bag Co.*, 614 F.2d 757, 763 n.2 (C.C.P.A.1980).

Defendant notes that the treaty was executed on behalf of Plaintiff by its President and Vice President/Corporate Actuary. (Def.'s Mem.Supp.Mot.Summ.J. Ex. 1, Ex. 2 at ¶ 5, Ex. 3 at 65). As a condition of the treaty, Plaintiff periodically reviewed AGL–PA's financial condition and received annual financial reports. (Def's Mem.Supp.Mot. Summ.J. Ex. 1, Ex. 3 at 42, Ex. 12). Defendant argues that the execution of this agreement by such high ranking corporate officers, and the periodic review of Defendant's financial condition, necessarily imputes knowledge of Defendant's use of "GUARD-IAN" to Plaintiff at the time the agreement was in effect.

Plaintiff counters that the individuals who executed the agreement on its behalf were part of Plaintiff's reinsurance department, and that they had no responsibility to report potential trademark violations. Plaintiff presents evidence that the reinsurance department is operated separately from the rest of the company and is in fact situated in a separate part of the building to ensure client confidentiality. (Kabele Dec. at ¶ 7). Therefore, Plaintiff contends that despite conducting business with AGL–PA for approximately four years, knowledge of AGL–PA's alleged infringement cannot be imputed to it.

Defendant alternatively argues that even if Plaintiff is not held to have had constructive knowledge by means of the reinsurance treaty, Plaintiff had notice during the period from 1985 through 1990 when AGL–PA operated Annapolis in over 20 states. Defendant supports with affidavits the claim that it took affirmative steps to build an association in the minds of customers and sales people between AGL–PA and Annapolis. (Def.'s Mem.Supp.Mot.Summ.J. Ex. 22 at ¶ 20). Defendant claims that stationary and promotional materials disseminated to the public and trade professionals in all of Annapolis's jurisdictions co-featured the names "Annapolis" and "American Guardian." (Def.'s Mem. Supp.Mot.Summ.J. Ex. 22 at ¶ 24). Further, Defendant claims that when AGL–PA took over Integrity's business, it notified the policy holders that AGL–PA was now the holder of the Integrity policies. (Def.'s Mem.Supp. Mot.Summ.J. Ex. 22 at ¶ 15). Finally, Defendant contends that even if none of the above circumstances was sufficient to place Plaintiff on notice of the alleged violation, Plaintiff should have had knowledge no latter than 1991, when Annapolis changed its name to American Guardian.

Plaintiff explains the timing of its lawsuit by characterizing Defendant's actions in the early 1990's as a rapid expansion from a company operating in 2 states to one seeking a national presence. Plaintiff disputes Defendant's characterization of its actions (and the actions of its predecessor AGL–PA) throughout the 1980's and early 1990's as a gradual expansion. Rather, Plaintiff points out that while AGL–PA owned Annapolis, AGL–PA itself was licensed in only 2 states. Therefore, Plaintiff argues, the "down stream merger" between AGL–PA and Annapolis, and the contemporaneous name change from Annapolis to American Guardian, constitutes a substantial change in the use of the mark.

Changes in the quality and quantity of the alleged infringing use can excuse delay in suing. In *University of Pittsburgh,* the United States Court of Appeals for the Third Circuit held that laches does not bar an injunction where the defendant changed from modest local sales to a program of national sales. "While [Plaintiff] may have acquiesced in the former, it promptly objected to the latter." 686 F.2d at 1046. *See also Parrot Jungle, Inc. v. Parrot Jungle, Inc.,* 512 F.Supp. 266, 270 (S.D.N.Y.1981) (stating that "a modest encroachment is one thing, a sudden proposed national exploitation of plaintiff's name is quite another, and plain-

tiff's failure to challenge the former will not entirely disable plaintiff from preventing the latter").

### E. Conclusion

■ It is unusual for a final determination of a laches defense to be made at the summary judgment phase of litigation. "[B]ecause the correct disposition of the equitable defense of laches can only be made by a close scrutiny of the particular facts and balancing of the respective interests and equities of the parties, as well as the general public, it usually requires the kind of record only created by full trial on the merits." *Country Floors v. Partnership of Gepner & Ford,* 930 F.2d 1056, 1066 (3d Cir.1991) (citation and internal quotations omitted). I find the same reasoning equally applicable to Defendant's other affirmative defenses.

It is clear that genuine issues of material fact exist with regard to the length of Plaintiff's delay, if any, and the resulting prejudice to Defendant. Even assuming *arguendo* that Plaintiff's delay in bringing suit exceeded the applicable two year statute of limitations, thereby raising a presumption that the delay was unreasonable, Plaintiff has presented sufficient evidence to raise a material issue of fact with regard to the length and egregiousness of that delay. The appropriate remedy with respect to damages and injunctive relief is presently not at all clear. Summary judgment in favor of Defendant is therefore inappropriate and will be denied.

### V. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN FAVOR OF ITS CLAIMS

Plaintiff moves for summary judgment in favor of its four claims. I will address each claim *seriatim.*

### A. Trademark Infringement—Count I

■ "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994) (quoting *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983)). To succeed in a claim of trademark infringement, the plaintiff must show that: (1) the mark is valid and legally protectable; (2) the plaintiff owns the mark; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. *Id.*

■ In this case, Defendant does not challenge the validity or ·ownership of Plaintiff's marks. The only issue in dispute between the parties is whether Defendant's use of the term "GUARDIAN" is likely to cause confusion with Plaintiff's marks.[8]

■ Likelihood of confusion is a question of fact and is at the very heart of trademark law. *Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 200 (3d Cir.1995); *Dranoff–Perlstein Assoc. v. Sklar,* 967 F.2d 852, 863 (3d Cir.1992); *American Home Products Corp. v. Barr Labs., Inc.,* 834 F.2d 368, 370–71 (3d Cir.1987). Likelihood of confusion exists where "the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Fisons Horticulture, Inc.,* 30 F.3d at 472 (quoting *Dranoff–Perlstein Assoc.,* 967 F.2d at 862).

■ The showing of proof that the plaintiff must make to establish likelihood of con-

---

**8.** The Third Circuit is one of only a few jurisdictions that recognize a lower level of interference in certain cases. Where an alleged infringer is new to an area where the plaintiff is well established, the standard may be lowered from "likelihood of confusion" to the "possibility of confusion." *Country Floors v. Partnership of Gepner & Ford,* 930 F.2d 1056, 1065 (3d Cir.1991) (adopting "possibility of confusion" standard where plaintiff had been operating in a particular area for over 14 years prior to the alleged infringer's arrival). *See also Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.,* 963 F.2d 628, 637–38

(3d Cir.1992) (applying "possibility of confusion" standard in trademark case); *but see Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 200–01 (3d Cir.1995) (acknowledging application of "possibility of confusion" standard in trademark cases but declining to adopt it in trade dress case). Defendant's predecessor's existence in Pennsylvania, Delaware, and the District of Columbia for a significant period of time prior to this action and the ongoing dispute as to the significance of AGL–PA's relationship with Annapolis, militate in favor of applying the more widely accepted likelihood of confusion standard to the analysis that follows.

fusion depends on whether the parties' goods or services are in direct competition. "Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself." *Fisons Horticulture, Inc.*, 30 F.3d at 472 (quoting *Interpace Corp. v. Lapp*, 721 F.2d 460, 462 (3d Cir.1983)). In such a case the court (as finder of fact) focuses on the marks to determine whether they are "confusingly similar." *Id.*

Where the goods or services are not in direct competition, the similarity of the marks is only one of several factors the court must examine to determine the likelihood of confusion. *Id.* at 473.

> To determine the likelihood of confusion where the plaintiff and defendant deal in non-competing goods or service, the court must look beyond the trademark to the nature of the products themselves, and to the context in which they are marketed and sold. The closer the relationship between the products, and the more similar their sales contexts, the greater the likelihood of confusion. Once a trademark owner demonstrates the likelihood of confusion, it is entitled to injunctive relief.

*Id.* (quoting *Lapp*, 721 F.2d at 462). The United States Court of Appeals for the Third Circuit has adopted a ten-factor test to determine likelihood of confusion in cases of non-competing products.[9]

As an initial matter, the parties dispute whether the ten-part *Fisons* analysis applies in this case. Plaintiff argues that the parties are in direct competition and therefore the Court need not look beyond the mark itself to determine the likelihood of confusion. Defendant contends that it is not in direct competition with Plaintiff because

Plaintiff advertises and markets directly to consumers via mass media while Defendant markets primarily to insurance brokers and agents through direct mail and trade publications. In support of this contention, Defendant points to the deposition testimony of Franklin Sorrentino, Plaintiff's Senior Vice President for Life Insurance, in which Mr. Sorrentino states that Plaintiff and Defendant are not in competition "on a product basis." (Def.'s Mem.Opp.Pl.'s Mot.Summ.J. Ex. 59 at 25). In the alternative, Defendant argues that even if the Court finds that the parties are in direct competition, it should consider the full context of the use, including the strength of the Plaintiff's marks.

Regardless of whether the Court limits its analysis to an examination of the marks themselves, or looks beyond the marks to the fuller context of the case, the conclusion is the same—summary judgment in favor of Plaintiff is inappropriate at this phase of the proceedings.

Examination of the parties' marks demonstrates that they are not identical. Defendant's use of the term "GUARDIAN" consist of its corporate name "American Guardian Life Assurance Company" and the shortened versions "American Guardian Life" and "American Guardian." Plaintiff's marks at issue in this case are its corporate name "The Guardian Life Insurance Company of America" and the shortened versions "The Guardian" and "Guardian." Defendant claims it does not use the names "The Guardian" or "Guardian" standing alone. Defendant further argues that the use of "American" in conjunction with "Guardian" is sufficiently distinctive to prevent confusion. In support of this contention, Defendant offers evidence of other insurance companies using geo-

---

9. The ten factors are: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to

which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; and (10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market. *Id. See also Dranoff–Perlstein*, 967 F.2d at 862–63; *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Scott Paper Co. v. Scott's Liquid Gold, Inc.* 589 F.2d 1225, 1229 (3d Cir.1978).

graphical terms to distinguish their use of the term "GUARDIAN." These uses include "National Guardian Life Insurance Company" "Pacific Guardian" and "Milwaukee Guardian." Therefore, based solely on an examination of the marks themselves, a genuine issue of material fact exists as to the likelihood of confusion.

■ Turning to the broader context of the case, Plaintiff marshals considerable evidence in favor of its position. Plaintiff points to numerous instances of actual confusion by consumers (*see* Pl.'s Mem.Supp.Mot.Summ.J. at 42 and submissions cited therein), sales personnel (*see* Pl.'s Mem.Supp.Mot.Summ.J. at 43 and submissions cited therein), medical and laboratory personnel (*see* Pl.'s Mem. Supp.Mot.Summ.J. at 43–44 and submissions cited therein), and others. Plaintiff also presents evidence of misdirected telephone calls (*see* Pl.'s Mem.Supp.Mot.Summ.J. at 45–46 and submissions cited therein), and misdirected mail (*see* Pl.'s Mem.Supp.Mot. Summ.J. at 46 and submissions cited therein). Plaintiff also points to instances where, during depositions, Defendant's own attorneys confused the two names. (*See* Pl.'s Mem.Supp.Mot.Summ.J. at 55–56 and deposition testimony cited therein). Actual confusion is one of the most reliable indications of likelihood of confusion. *Dominion Bankshares Corp. v. Devon Holding Co., Inc.,* 690 F.Supp. 338, 347 (E.D.Pa.1988) (citing *Louisiana World Exposition, Inc. v. Logue,* 746 F.2d 1033, 1041 (5th Cir.1984)).

Additionally, Plaintiff notes that on May 17, 1996, the Patent and Trademark Office ("PTO") issued an Office Action refusing registration to Defendant for the marks "AMERICAN GUARDIAN LIFE" and the design "AMERICAN GUARDIAN LIFE ASSURANCE COMPANY." (Pl.'s Rply. Supp.Mot.Summ.J. at 23–26; Richard Dec.

6/3/96 Ex. 6). In denying Defendant's application, the Examining Attorney stated that "the dominant element among the marks is the same, namely, GUARDIAN. The services of both parties (AGL and GLIC) are highly related. The overall similarities among the marks and the services are so great as to create a likelihood of confusion among consumers." (Richard Dec. 6/3/96 Ex. 6). Defendant may respond to the refusal to register by submitting evidence and arguments in support of registration.

■ While not dispositive of the issue of likelihood of confusion, the PTO's refusal to register Defendant's marks is entitled to substantial consideration by this Court. *See Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 437 F.2d 566, 569 (2d Cir.1971); *Paolo Gucci v. Gucci Shops, Inc.,* 688 F.Supp. 916, 927 (S.D.N.Y.1988).

■ Defendant's primary argument against likelihood of confusion is that Plaintiff's marks are so weak and diluted that they are not entitled to the protection Plaintiff seeks. The Court uses two general principles to determine the strength or weakness of a mark; the first is the distinctiveness of the mark,[10] the second is the commercial strength or marketplace recognition of the mark. *Fisons Horticulture, Inc.,* 30 F.3d at 479.

■ The heart of Defendant's case, and the point of much contention between the parties, is Defendant's argument that Plaintiff's marks are weak and entitled to little or no protection due to the existence of numerous third party users of the term "GUARDIAN." Evidence of third party use of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrow

---

**10.** The distinctiveness of a mark is measured along a five-part continuum of generally increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). The parties disagree as to whether the term "GUARDIAN" is descriptive, as Defendant contends, or merely suggestive or arbitrary as Plaintiff contends. The placement of a mark along this spectrum is a disputed question of fact

the resolution of which is inappropriate at this time. *See Union Nat. Bank Laredo v. Union Nat. Bank Austin,* 909 F.2d 839, 847 (5th Cir.1990) (holding distinctiveness of mark is a question of fact and stating that "while at times the appropriate categorization [of a mark] may seem self-evident, and therefore unnecessary of clarification through the presentation of evidence.... we should be wary of leaping too quickly to any conclusion before a full presentation of the evidence").

scope of protection. *See General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626–27 (8th Cir.1987); *Sun Banks of Florida, Inc. v. Sun Federal Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir.1981); *Chips 'N Twigs, Inc. v. Chip–Chip, Ltd.*, 414 F.Supp. 1003, 1017 (E.D.Pa.1976).[11]

Defendant points to at least two regional life insurance companies in addition to itself that use the term "GUARDIAN:" (1) National Guardian Life Insurance Company (operates primarily in the upper midwest since 1910—its mark is incontestable); (2) Pacific Guardian Life Insurance Company (operates primarily in Hawaii and the West coast). Defendant also points to third parties using "GUARDIAN" in connection with other insurance products including: (1) Milwaukee Guardian (property and casualty insurance); (2) Financial Guardian of Texas (property and casualty insurance); (3) Guardian Underwriters (physical damage and liability insurance); (4) Guardian Insurance Group, Inc. (automobile, health, property, and casualty insurance); (5) The Guardian Agency (property and casualty insurance); (6) Guardian Insurance Agency (property and casualty insurance); (7) Guardian Insurance Agency (property and casualty insurance).

Plaintiff argues that it has protested most of the uses listed above, has undertaken settlement negotiations with many of the parties, and has already executed consent judgments with several. Plaintiff also argues

that many of these third party users are so small, both financially and geographically, that their use of "GUARDIAN" is *di minimis*. While this may be so, such arguments go to the weight afforded the evidence by the finder of fact.

Examining all of this evidence in the light most favorable to Defendant as the non-moving party, I conclude that a genuine issue of material fact exists regarding the likelihood of confusion between the parties' marks. Resolution of this issue would require the court to make findings of fact not appropriate at summary judgment. Accordingly, Plaintiff's motion for summary judgment on Count I of its Complaint will be denied.

### B. False Designation of Origin—Count II

■ Plaintiff's Count II seeks recovery for false designation of origin under § 43(a) of the Lanham Act. 15 U.S.C.A. § 1125(a). Likelihood of confusion is also the test for actions brought under § 43(a). *Fisons Horticulture, Inc.*, 30 F.3d at 473. The analysis applicable to an unfair competition claim under § 1125(a) is essentially the same as that applied to an infringement claim under § 1115. *Id.* Therefore, Plaintiff's motion for summary judgment on Count II of its Complaint will be denied for the same reasons stated above.

11. Defendant seeks to submit substantial evidence of third party use including a trademark search report identifying more than 600 federally registered marks and published, pending, or abandoned trademark applications incorporating the word "GUARDIAN." Defendant also submits approximately 170 state registrations or applications for marks including the term "GUARDIAN," over 4000 businesses nation wide whose names include "GUARDIAN," and telephone directories showing numerous listings for businesses incorporating the word "GUARDIAN." Finally, the parties provide a joint stipulation as to 29 third party users.

Plaintiff filed a motion *in limine* objecting to evidence of third party users in fields other than life insurance. Plaintiff argues that such evidence is irrelevant pursuant to Fed.R.Evid.Rule 401, and that its probative value is substantially outweighed by the danger of unfair prejudice to Plaintiff pursuant to Fed.R.Evid.Rule 403. In addition to uses outside of the insurance industry, Plaintiff would have this Court exclude from

consideration use within the insurance industry which is not directly related to the sale of life insurance. I find no reason to circumscribe Defendant's evidence so strictly. While Defendant's business is limited to life insurance and annuities, Plaintiff's business is diverse, encompassing a variety of insurance and financial services. While insurance professionals draw a clear distinction between life insurance and other insurance products, that distinction is not so well defined in the minds of the consuming public.

I find that evidence of third parties using the term "GUARDIAN" in connection with insurance products, such as property, casualty, liability, health, and automobile insurance, is probative of the strength of Plaintiff's marks and not unduly prejudicial to Plaintiff. I decline to rule at this time on the admissibility of Defendant's evidence of third party uses outside the insurance industry. Accordingly, the analysis that follows takes into consideration only that third party evidence that I have thus far ruled admissible.

### C. Dilution Under Pennsylvania Law— Count III

Pennsylvania's dilution statute reads as follows:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

54 Pa.Cons.Stat.Ann. § 1124 (West Supp. 1996).

 To prevail on a claim under Pennsylvania's dilution statute, the Plaintiff must establish that its mark has a "distinctive quality." *Nugget Distribs. Co–Op. v. Mr. Nugget, Inc.*, 776 F.Supp. 1012, 1024 (E.D.Pa.1991). The plaintiff meets this requirement if it proves that its mark has acquired secondary meaning in the infringer's market. *Id.* (citing *American Int'l Group v. American Int'l Airways*, 726 F.Supp. 1470, 1482 (E.D.Pa.1989)). The presence or absence of predatory intent on the part of the infringer is also a relevant consideration. *Id.* (citing *Moore Push–Pin Co. v. Moore Business Forms, Inc.*, 678 F.Supp. 113, 117 (E.D.Pa.1987)). The Court must then go on to determine whether the alleged infringer's use is likely to dilute the distinctive quality of the plaintiff's mark. *Id.* Section 1124 also provides for injunctive relief where the defendant's action creates a likelihood of injury to the plaintiff's business reputation. 54 Pa.Cons.Stat.Ann. § 1124.

 The primary point of contention between the parties is the existence of secondary meaning for Plaintiff's marks. Secondary meaning exists where the term has been used for so long, or advertised so extensively, that the public immediately associates the term with one particular enterprise. *See McCarthy on Trademarks* § 11.09 (and cases cited therein). The existence of secondary meaning is a question of fact. *Id.; Dranoff–Perlstein Assoc.*, 967 F.2d at 862.

 Plaintiff argues that its long history and substantial marketing efforts give rise to secondary meaning. In support of this proposition, Plaintiff points to two prior District Court opinions which hold that Plaintiff's GUARDIAN marks have acquired secondary meaning in the insurance industry. *See The Guardian Life Insurance Co. of America v. The Guardian Group–Gerardi Assoc., Inc.*, 27 U.S.P.Q.2d 1465, 1993 WL 373818 (D.Conn.1993); *The Guardian Life Insurance Company of America v. American Guardian Life Insurance Co.*, No. c–110–62 (D.Utah 1963). While persuasive, this Court is not bound by these prior holdings in unrelated litigation to which this Defendant was not a party. *See generally Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552 (1979) (noting that it is a violation of due process for a judgment to be binding on a litigant who was not a party or privy to the previous litigation).

 Evidence that others are using a term on the same or similar goods is probative to rebut a claim of secondary meaning. *Roselux Chemical Co. v. Parsons Ammonia Co.*, 299 F.2d 855, 863 (C.C.P.A.1962). Defendant argues that its evidence of third parties using the term "GUARDIAN" indicates that Plaintiff's marks have not attained secondary meaning and are already so diluted that Defendant's use will not cause further dilution.

Despite the strength of Plaintiff's evidence, I conclude that Defendant's evidence of third party users is sufficient to raise a genuine issue of material fact regarding whether Plaintiff's marks have attained a distinctive quality and, if so, whether that distinctive quality will be diluted by Defendant's use. Accordingly, Plaintiff's Motion for Summary Judgment on Count III of its Complaint will be denied.

### D. Unfair Competition Under Pennsylvania Common Law—Count IV

The elements of a cause of action for unfair competition under Pennsylvania Common Law are identical to those for a claim under § 43(a) of the Lanham Act, with the exception that the goods need not have traveled in interstate commerce. *Moore Push–Pin Co.*

*v. Moore Business Forms, Inc.*, 678 F.Supp. 113, 116 (E.D.Pa.1987) (quoting *Mercury Foam Corp. v. L & N Sales & Marketing*, 625 F.Supp. 87, 91 n. 1 (E.D.Pa.1985)); *see also Morgan's Home & Equip. Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 848 (1957) (noting "deceptive selling practices ... [are] enjoinable on the grounds of unfair competition. If the particular use in question is reasonably likely to produce confusion in the public mind, equity will restrain the unfair practice").

Having previously concluded that likelihood of confusion presents a genuine issue of material fact, Plaintiff's motion for summary judgment on Count IV of its Complaint will be denied for the same reasons articulated above.

## VI. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT'S COUNTERCLAIMS

### A. Libel & Trade Libel—Counterclaim III

Plaintiff now moves for summary judgment on each of Defendant's remaining counterclaims. Defendant's third counterclaim asserts causes of action for libel under 42 Pa.Cons.Stat.Ann. § 8343(a) (West 1990) and trade libel under Pennsylvania common law. Under § 8343, a party asserting an action for defamation (libel) has the burden of proving: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the Plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient that it is intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa.Cons.Stat.Ann. § 8343(a)(1)–(7).

■ To sustain a claim for trade libel (otherwise known as "commercial disparagement") under Pennsylvania law, the complainant (here Defendant) must prove the following elements: (1) that the disparaging statement of fact is untrue or that the disparaging statement of opinion is incorrect; (2) that no privilege attaches to the statement; and (3) that the claimant suffers a direct pecuniary loss as a result of the disparagement. *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3d Cir.1990).

■ Under Pennsylvania law, a defamatory statement is one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *U.S. Healthcare*, 898 F.2d at 923; *accord Elia v. Erie Ins. Exchange*, 430 Pa.Super. 384, 634 A.2d 657, 660, *appeal denied*, 537 Pa. 662, 644 A.2d 1200 (1993). Similarly, a commercially disparaging statement is one "which is intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, or upon their quality ... if the matter is so understood by its recipient." *Id.* (internal quotation marks omitted) (quoting *Menefee v. Columbia Broadcasting Sys., Inc.*, 458 Pa. 46, 329 A.2d 216, 220 (1974)).

In the instant case, the statements in issue are contained in letters sent by Plaintiff to the insurance commissioners of several states in which Defendant sought to acquire licenses to sell insurance. As stated *supra*, the letters purportedly contained the following statements which Defendant claims are false:

1. Defendant has recently expanded its use of the name American Guardian from its initial two-state sales territory to twenty-seven states;

2. Defendant has changed its product mix from annuities to term and ordinary life insurance as well as health and disability insurance; and

3. Defendant's geographic expansion, change of product emphasis from annuities to life insurance, and expansion into health insurance appears to be designed to create confusion.

In its Memorandum and Order disposing of Plaintiff's motion to dismiss, this Court held that the statements contained in the letters were likely to deter the commissioners from dealing with Defendant and were therefore capable of a defamatory meaning. *See U.S. Healthcare*, 898 F.2d at 923 (noting

that the determination of whether particular statements are capable of defamatory meaning is decided in the first instance by the court as a matter of law; it is then for the finder of fact to determine if the statement was so understood by the reader or listener); *accord Elia,* 634 A.2d at 660.

The Court further concluded that because the statements contained issues of concern to Plaintiff (the spread of Defendant's potentially confusing name and marks), as well as to the states' insurance commissioners (the licensure of Defendant), they enjoyed conditional privilege. *See Sugarman v. RCA Corp.,* 639 F.Supp..780, 787 (M.D.Pa.1985) (holding that a proper occasion giving rise to a conditional privilege exists when some interest of the person who publishes defamatory matter is involved, some interest of the person to whom the matter is published or some other third person is involved, or a recognized interest of the public is involved).

■■■ Once a defendant has shown that a particular communication is conditionally privileged, the burden shifts to the plaintiff to show an abuse of that privilege. *U.S. Healthcare,* 898 F.2d at 923; *Elia,* 634 A.2d at 661. Abuse is indicated when publication of the defamatory material is the result of malice. *Elia,* 634 A.2d at 661. Malice, in turn, consists of a wrongful act, done intentionally without just cause or excuse, *Corabi v. Curtis Publishing Co.,* 441. Pa. 432, 273 A.2d 899, 909 (1971) (abrogated on other grounds); *Elia,* 634 A.2d at 661 n. 2., or generated from reckless or wanton disregard of another's rights. *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 191 A.2d 662, 668 (1963); *Elia,* 634 A.2d at 661 n. 2.

■■■ In the context of the motion to dismiss, this Court concluded that Defendant pled allegations of fact which, if believed, would allow a jury to conclude that Plaintiff acted with malice. Plaintiff now argues that the record before the Court is devoid of any evidence of malice, and that judgment should accordingly be entered in Plaintiff's favor. I agree.[12]

Defendant argues that Plaintiff acted with malice because it failed to adequately investigate the factual allegations contained in the letters. Such lack of investigation, Defendant contends, demonstrates a reckless or wanton disregard for Defendant's rights.

In support of its argument that it acted appropriately, Plaintiff presents the deposition testimony of John Peluso, Plaintiff's vice president and associate general counsel, who testified that the assertions contained in Plaintiff's letters to the insurance commissioners were based on information published in *Best's Reports.* (Peluso Dep. at 153–55).

The entirety of Defendant's argument relies on the contention that the factual allegations contained in the letters were incorrect, and that a more thorough investigation would have revealed the error. However, Defendant presents *no countervailing affidavits or other evidence* to support its contention that Plaintiff's reliance on *Best's Reports* was so inadequate or otherwise improper as to constitute malice. To the contrary, Defendant admits that *Best's Reports* is the insurance industry's "bible." (Def.'s Mem.Opp.Pl.'s Mot.Summ.J. at 2). Even assuming *arguendo* that the information drawn from *Best's Reports* was in error, mere negligence does not constitute malice.

Nothing on the record indicates that Plaintiff acted with the kind of malicious intent necessary to overcome the conditionally privileged nature of the communications. I conclude that, based on the submissions before me, judgment must be entered in favor of Plaintiff as to Defendant's third counterclaim.

### B. Cancellation—Counterclaim V

■■■ Defendant's fifth counterclaim seeks cancellation of Plaintiff's federal registrations. To succeed on a petition for cancellation, the plaintiff must prove: (1) that it has standing to petition for cancellation because it is likely to be damaged; and (2) that there are valid grounds for discontinuing the regis-

---

12. Plaintiff argues in the alternative that its communications to the insurance commissioners are entitled to absolute privilege under the judicial proceedings doctrine. Because I will grant

Plaintiff's motion as to counterclaim III on other grounds, I need not reach the judicial proceedings argument.

tration. *Coach House Restaurant v. Coach and Six Restaurants,* 934 F.2d 1551, 1557 (11th Cir.1991).

■ Section 14 of the Lanham Act provides standing to pursue cancellation to "any person who believes that he is or will be damaged by the registration." 15 U.S.C.A. § 1064. To establish a reasonable basis for a belief that one is or will be damaged by the challenged registration, the plaintiff may assert, among other things, a likelihood of confusion that is not wholly without merit. *Lipton Indus., Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 1029 (C.C.P.A.1982). Defendant has argued, in the alternative to its primary argument in this case, that likelihood of confusion exists between the parties' marks. Based on this Court's previous discussion of this issue, Defendant's contention is clearly not wholly without merit.

■ Defendant must also provide valid grounds for discontinuing Plaintiff's registrations. For registrations that are less than five years old, cancellation may be based on any ground which could have prevented registration initially. *Person's Co., Ltd. v. Christman,* 900 F.2d 1565, 1568 (Fed.Cir. 1990). Registrations more than five years old may be cancelled:

> At any time if the registered mark becomes the generic name of the goods or services, or a portion thereof, for which it is registered, or has been abandoned, or its registration was obtained fraudulently.

15 U.S.C.A. § 1064(3).

■ Defendant advances four theories to support its case for cancellation. First, Defendant argues that the term "GUARDIAN" has become a generic name for life insurance. A mark is generic if it "refe[rs] to a genus of which the particular product is a species." *Two Pesos, Inc.,* 505 U.S. at 768, 112 S.Ct. at 2757. Defendant presents no evidence to support its contention that "GUARDIAN" is a generic term—a contention which defies common sense. Defendant's argument on this ground fails.

■ Defendant argues in the alternative that "GUARDIAN" is a descriptive term and is devoid of secondary meaning. Such an allegation, if true, is an appropriate ground

for cancellation of a mark that is less than five years old. *Neapco, Inc. v. Dana Corp.,* 12 U.S.P.Q.2d 1746, 1747 (T.T.A.B.1989). As discussed above, the determination of whether the term "GUARDIAN" is descriptive, as Defendant contends, or suggestive, as Plaintiff contends, is a disputed question of fact that the Court declines to decide at summary judgment. The existence of secondary meaning also presents a genuine issue of material fact. Therefore, Defendant's cancellation claim will go forward on this theory as to those of Plaintiff's registrations that were less than five years old at the initiation of this suit.

■ Defendant's third theory is that Plaintiff's delay in bringing this action, combined with its alleged failure to prosecute other third party users of "GUARDIAN," constitutes an abandonment by Plaintiff of its marks. Abandonment is a term of art in trademark proceedings. Section 45 of the Lanham Act defines abandonment as follows:

> A mark shall be deemed to be "abandoned" if either of the following occurs:
>
> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.
>
> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C.A. § 1127.

While the circumstances Defendant asserts may support its defenses of laches and acquiescence, or may be probative of the strength or weakness of Plaintiff's marks, they do not demonstrate abandonment. Defendant has provided no indication that Plaintiff discon-

tinued use of its marks or intended not to resume that use. Additionally, as previously stated, "GUARDIAN" is not a generic term. Therefore, Defendant's abandonment argument fails.

▇▇▇▇▇▇▇ Defendant's final theory supporting cancellation is the allegation that Plaintiff procured its registrations through fraud. The party seeking cancellation bears the burden of proving the essential elements of fraud by clear and convincing evidence. *Dial–A–Mattress v. Mattress Madness,* 841 F.Supp. 1339, 1353 (E.D.N.Y.1994). To succeed on its claim, Defendant must demonstrate:

(1) A false representation regarding a material fact;

(2) Knowledge or belief that the representation was false ("scienter");

(3) An intention to induce the listener to act or refrain from acting in reliance upon the misrepresentation;

(4) Reasonable reliance upon the misrepresentation; and

(5) Damage proximately resulting from such reliance.

*Id.*

▇▇▇▇ Defendant's fraud claim is based on the assertion that Plaintiff failed to disclose concurrent third party use of "GUARDIAN" when it filed its trademark applications. However, a trademark applicant must disclose only those users known to have the *right* to use the same or related marks. 15 U.S.C.A. § 1051(a)(1). The applicant has no obligation to disclose known users believed to be infringing on the applicant's rights in the mark. *Dial–A–Mattress,* 841 F.Supp. at 1353.

Plaintiff has steadfastly maintained throughout this litigation that it holds the exclusive rights to the term "GUARDIAN." While Defendant's submissions support the contention that Plaintiff's may have been aware of third party users at the time of its applications, there is nothing on the record that could provide clear and convincing evidence that Plaintiff knew of any other party that had the *right* to use the term "GUARDIAN." Consequently, there is neither evidence of a knowingly false statement to the

PTO, nor of Plaintiff's intent to induce the PTO to rely on such a misrepresentation. Therefore, Defendant's fraud argument fails.

### C. Defendant's Remaining Counterclaims

Defendant's fourth counterclaim seeks a declaratory judgment that it is entitled to use its name and marks. Defendant's sixth counterclaim seeks registration of its marks. These counterclaims are based on Defendant's affirmative defenses of laches, acquiescence and estoppel, as well as on its contention that the marks are not confusingly similar. Resolution of these counterclaims will depend on the outcome of those defenses. Therefore summary judgment against Defendants fourth and sixth counterclaims is inappropriate.

### VII. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT'S AFFIRMATIVE DEFENSES

In its Answer and Counterclaims, Defendant asserts ten separate affirmative defenses. Plaintiff seeks summary judgment against each of these affirmative defenses.

Preliminarily, three of Defendant's affirmative defenses assert laches and acquiescence, estoppel, and violation of the applicable statute of limitations (affirmative defenses number four, five, and ten respectively). These affirmative defenses serve as the basis for Defendant's motion for summary judgment. As discussed *supra,* genuine issues of material fact exist as to each of these defenses. Therefore, Plaintiff's motion for summary judgment will be denied as to Defendant's affirmative defenses number four, five, and ten.

Defendant's affirmative defense number one asserts that Plaintiff's Complaint fails to state a claim upon which relief can be granted. Plaintiff's four-count Complaint clearly states cognizable causes of action. Therefore, Plaintiff's motion for summary judgment will be granted as to Defendant's first affirmative defense.

Defendant's second affirmative defense asserts that Defendant is entitled to use its

"GUARDIAN" names and marks. As discussed *supra*, genuine issues of material fact exist with respect to this issue, particularly regarding to the likelihood of confusion between the parties' marks. Therefore, Plaintiff's motion for summary judgment will be denied as to Defendant's second affirmative defense.

■ Defendant's third affirmative defense asserts that its use of "GUARDIAN" antedates Plaintiff's federal registration of its marks. Defendant claims to have been using "GUARDIAN" in its name (and that of its predecessor) since 1971. According to Plaintiff's Complaint, only one of its 28 service marks predates Defendant's alleged use. That mark, "YOUR GUARDIAN FOR LIFE" was registered in September of 1968, (Compl. at ¶ 20), and is not directly at issue in this case. While Plaintiff claims to have been using the term "GUARDIAN" since 1918, Defendant's third defense only references Plaintiff's dates of registration, not its common law use. Therefore, Plaintiff's motion for summary judgment will be denied as to Defendant's third affirmative defense.

■ Defendant's sixth affirmative defense asserts the equitable defense of unclean hands. This defense is based entirely on Plaintiff's allegedly libelous statements contained in the letters to the insurance commissioners. As discussed *supra*, judgment will be entered in favor of Plaintiff on Defendant's libel and trade libel claims. However, a parties' misconduct need not have been of such a nature as would justify legal proceedings in order to justify invocation of the doctrine of unclean hands. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815, 65 S.Ct. 993, 998–99, 89 L.Ed. 1381 (1945). "Any wilful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of [the doctrine of unclean hands]." *Id.*

■ While Plaintiff's letters do not constitute libel or trade libel under Pennsylvania law, they might give rise to a finding of unclean hands if Defendant can successfully prove that the letters transgressed the equi-

table standards of conduct appropriate to such communications. Plaintiff's motion for summary judgment will therefore be denied as to Defendant's sixth affirmative defense.

Defendant's seventh affirmative defense asserts that the term "GUARDIAN" is a descriptive term and therefore not entitled to trademark protection without proof of secondary meaning. Defendant further contends that Plaintiff's marks have not acquired secondary meaning.

As discussed *supra*, the placement of the term "GUARDIAN" along the continuum of trademark distinctiveness is a disputed question of fact and is not appropriately resolved at the summary judgment phase of this litigation. Further, assuming *arguendo* that "GUARDIAN" is indeed descriptive, genuine issues of material fact exist regarding the existence of secondary meaning. Therefore, Plaintiff's motion for summary judgment will be denied as to Defendant's seventh affirmative defense.

■ Defendant's eighth affirmative defenses asserts that Defendant adopted the term "GUARDIAN" in good faith prior to Plaintiff's dates of registration of its marks and prior to Plaintiff's constructive use of "GUARDIAN." Plaintiff repeatedly asserts throughout its pleadings, and supports with affidavits, the contention that it has used the term "GUARDIAN" in Pennsylvania since 1918. Defendant has presented nothing to contradict Plaintiff's assertion or to demonstrate that its own use predates Plaintiff's constructive use. Therefore, judgment will be entered in favor of Plaintiff as to Defendant's eighth affirmative defense only to the extent that that defense seeks to assert that Defendant used its marks prior to Plaintiff's constructive use of "GUARDIAN" in Pennsylvania.

Defendant's ninth affirmative defense asserts that third party use of "GUARDIAN" demonstrates the weakness of Plaintiff's marks and precludes Plaintiff's claim of dilution. As discussed *supra*, the strength or weakness of Plaintiff's marks, and the existence of dilution, are genuine issues of material fact that remain in dispute. Therefore, Plaintiff's motion for summary judgment will

be denied as to Defendant's ninth affirmative defense.

## VIII. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment will be denied. Plaintiff's motion for summary judgment will be granted as to Count III of Defendant's counterclaims, and granted in part as to Count V of Defendant's counterclaims to the extent that Defendant may pursue its claim for cancellation only against Plaintiff's registrations that are less than five years old and only based on the question of the marks' descriptiveness as discussed *supra*. Plaintiff's motion will also be granted as to Defendant's first affirmative defense, and as to Defendant's eighth affirmative defense to the extent articulated above. Plaintiff's motion for summary judgment will be denied in all other respects. Plaintiff's motion *in limine* to exclude evidence of third party uses of the term "GUARDIAN" will be denied to the extent that evidence of third party uses within the insurance industry, as discussed *supra*, will be admissible at trial. The Court defers ruling on the admissibility of Defendant's remaining evidence of third party uses until trial.

An appropriate Order follows.

### *ORDER*

AND NOW, this 13th day of August, 1996, upon consideration of the parties' cross-motions for summary judgment and the accompanying submissions, and Plaintiff's motion *in limine* and the submissions in support thereof and in opposition thereto, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for Summary Judgment (Doc. No. 64) is DENIED.

2. Plaintiff's Motion for Summary Judgment (Doc. No. 65) is GRANTED IN PART and DENIED IN PART, in accordance with the Court's Memorandum filed contemporaneously with this Order, as follows:

 A. Judgment is entered in favor of Plaintiff as to Count III of Defendant's Counterclaims;

 B. Partial judgment is entered in favor of Plaintiff as to Count V of Defendant's Counterclaims. Defendant may pursue cancellation of Plaintiff's marks that are less than five years old on the theory that such marks are descriptive;

 C. Judgment is entered in favor of Plaintiff as to Defendant's first affirmative defense;

 D. Partial judgment is entered in favor of Plaintiff as to Defendant's eighth affirmative defense. Defendant is barred from seeking to prove it adopted the term "GUARDIAN" in good faith prior to Plaintiff's constructive use of its names and marks in Pennsylvania;

 E. Plaintiff's Motion for summary judgment is DENIED in all other respects.

3. Plaintiff's Motion *in limine* (Doc. No. 62) is DENIED IN PART. In accordance with this Court's Memorandum filed Contemporaneously with this Order, evidence of third party uses of the term "GUARDIAN" in the insurance industry is deemed relevant and not unduly prejudicial to Plaintiff and is admissible at trial to the extent otherwise permitted by the Federal Rules of Evidence.